Filed 2/20/26  P. v. Hernandez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD GIOVANI HERNANDEZ,<br><br>    Defendant and Appellant. | B339050<br><br>(Los Angeles County Super. Ct. No. BA348445) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2008, Edward Giovani Hernandez, a member of the Mara Salvatrucha (M.S.) criminal street gang, approached the owners of a "casita," an underground bar, and threatened the owners into agreeing to pay him in exchange for his protection. Once Hernandez established the arrangement, he sent codefendant Boris Bonilla—his brother and another member of M.S.—to the casita to provide security. One night, while Bonilla was monitoring the casita and Hernandez was absent, a man arrived, proclaimed membership in a rival gang, and stated the casita was in his territory. Bonilla communicated with Hernandez by text and phone and told one of the owners that he was letting his brother know "to see what was going to happen." Bonilla then followed the man outside and shot him to death.

A jury convicted Hernandez in 2012 of first degree murder and attempted extortion, after the trial court instructed the jury on, among other things, felony murder and the natural and probable consequences doctrine. Hernandez later petitioned for resentencing under Penal Code[1] section 1172.6 (former section 1170.95) as to his murder conviction. Following briefing and an evidentiary hearing, at which neither party submitted new evidence, the superior court denied the petition, finding the People proved beyond a reasonable doubt that Hernandez was guilty of either felony murder or implied malice murder under still-valid theories.

Hernandez argues substantial evidence did not support the superior court's determination. We conclude substantial evidence supported the court's finding beyond a reasonable doubt that Hernandez was a major participant in the underlying felony and

---

[1]     Statutory references are to the Penal Code.

acted with reckless disregard for human life, and thus was guilty of felony murder under a theory that is still valid under section 189, subdivision (e).  We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Relevant Evidence at Trial*
      1.    *The casita and the payment arrangement*
Casitas, or "little houses" in Spanish, are (in this context) illegal after-hours venues operated out of apartments, houses, or abandoned businesses.  They sell alcohol and drugs and often offer gambling and sex work.  Casitas are not safe places, given these illicit activities.  When a casita opens in gang territory, a gang member will typically approach the casita's owner, determine how much money the casita is making, and demand payment or "taxes."  Casita owners generally comply with the gang's demands because they perceive the demands as threats.

The gang that establishes control over a casita may allow rival gang members to participate in the casita's activities so long as those rivals follow the rules and do not attempt to take over the casita.  The controlling gang usually installs its own members in the casita to protect it from rival gang members and to ensure the casita's owners are paying the gang the correct amount of money.  Generally, the controlling gang is only concerned with protecting its interest in the casita's revenue, not the safety of the casita's patrons.  To protect its interest, the controlling gang will likely use "force and violence," which may include "shooting and killing someone."

On September 10, 2008, Evelyn V. and Jimmy P.[2] opened a casita at their apartment in Los Angeles. They advertised their casita by distributing business cards at bars throughout the neighborhood, including at a bar where Hernandez worked.

Within days of opening the casita, Evelyn was at home when she received a phone call from her sister, who said a man named Cesar had called and was demanding to speak to Evelyn. (Evelyn's sister had Evelyn's cellphone at the time and had answered a call to that phone.) The man told Evelyn's sister, " 'I'm outside [the casita] . . . on some motorcycles, and if [Evelyn] doesn't come out, I'm going to beat down the doors.' "

Evelyn went outside and saw a group of men standing near three or four motorcycles. Evelyn asked whom to speak to, and someone pointed to Hernandez. Hernandez confirmed he was the man who spoke to Evelyn's sister on the phone. Hernandez then told Evelyn she had to pay him so that he could protect the casita from "cholos" in the neighborhood.[3] Hernandez said the cholos "kill[ed] people" and would not mind killing Evelyn, but they would not harm anyone if they knew he was in charge of the casita. Hernandez said he would keep gang members from going to the casita. Evelyn told Hernandez about the problems she was having at the casita with fights among customers and the police showing up.

Evelyn told Hernandez she needed to speak to Jimmy before entering into any potential agreement. Hernandez gave

---

[2] We refer to the witnesses by their first name and last initial to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (b)(10).)

[3] Evelyn understood the term "cholo" to refer to a gang member.

Evelyn his phone number and said to call him once she made up her mind.

The next day, Evelyn saw Hernandez at a restaurant. Afraid that Hernandez had followed her, Evelyn called him and said she wanted to meet to discuss a payment arrangement.

Later that night, Evelyn and Jimmy met Hernandez at the casita. Hernandez said he wanted to collect a weekly "rent" of $350 from the casita in exchange for protection "from danger." He said he would send someone to the casita to sell drugs, he would take all the proceeds from the drug sales, and he would send another person to the casita to watch the inside. He stated he hoped they could reach an agreement because "he didn't want any trouble." Jimmy said the fee was too high and Hernandez lowered it to $250. Hernandez told Jimmy that if Jimmy did not go along with the plan, he would have to threaten him. Jimmy and Evelyn then agreed to Hernandez's arrangement because they were too afraid to say no.

Hernandez told Evelyn and Jimmy that "he was the one who gave orders and would take care of that area." Hernandez said "he was supervising and taking care of the casita, that he was going to take care of us and that he would send people to work outside to supervise whether the police [were] coming and whether other people, strange people, would get close to the casita, and that he would send somebody to sell drugs." Hernandez said he had "people who worked underneath him" and "took care of the area for him."[4]

---

[4] Jimmy testified that Hernandez told him and Evelyn these things on the same day that Hernandez first contacted Evelyn by phone; he believed Hernandez and Bonilla came inside the house

The next night, Hernandez returned to the casita with a man named Willie and said Willie would sell drugs in the casita. At some point, Hernandez also came to the casita with Bonilla. Hernandez said Bonilla would be "in charge" and would watch the inside of the casita to ensure no one else sold drugs.

On September 19, 2008, in the late evening, Hernandez, Willie, and Bonilla came to the casita. Hernandez and Willie sold drugs to the casita's patrons while Bonilla sat by himself near the kitchen.

2. *The shooting*

The next night, Bonilla returned to the casita. A new person also arrived who Bonilla said would sell drugs, per Hernandez's instructions. Hernandez was not there. Throughout most of the night, Bonilla sat by himself and did not speak to anyone.

At 3:30 a.m., Jose Enriquez Mendez, a young man who lived above the casita, arrived. He was already drunk, so Evelyn tried to turn him away. Mendez refused to leave and asked for a beer.

Another man at the bar approached Evelyn and touched her shoulder. Mendez told the man not to touch her, and the men started arguing. Mendez then announced he was a cholo who "belonged to 18th Street," a local gang, and "no one could touch him." Mendez also approached Jimmy and told him that he could "take care of" the man who was "bugging [his] wife." Jimmy told him that everything was fine. Mendez said "it was his territory"

_____

that first day. According to Jimmy, during that initial meeting Hernandez introduced himself but did not introduce Bonilla, and Bonilla did not introduce himself or speak during the conversation.

6

and "if anything happened, he was there to take care of it." At one point, he pulled up his shirt to show a small tattoo of the number "18" on his chest.

While Mendez was doing these things, Bonilla watched angrily and picked up his phone. Evelyn approached Bonilla and asked him to calm down because he looked upset and angry. "He told [Evelyn] that he was texting his brother which [*sic*] what was going to happen." On cross-examination, Evelyn stated she "told [Bonilla] to calm down, and he said, no, that he was letting his brother know to see what was going to happen." Bonilla also said (apparently in reference to himself) that "he was a person who wouldn't put up with much" and "he didn't care what could happen." On re-cross, Bonilla's counsel asked Evelyn, "You were asked yesterday by [Hernandez's counsel] about the text messaging, when you walked up to [Bonilla] and he appeared upset, and he was text messaging, and you asked him—or you said 'calm down,' and he said he was text messaging his brother and words to the effect of to ask what was next, something like that. Do you remember that?" Evelyn responded, "Yes."

Phone records showed that on the night of the murder, a prepaid phone associated with Bonilla sent text messages to a phone associated with Hernandez at 3:35 and 3:39 a.m. Additionally, records showed that at 3:21 and 3:48 a.m., the phone linked to Hernandez called the prepaid phone, and the calls lasted for 142 seconds and 43 seconds, respectively. There were no records of the contents of the texts or phone calls.

Jimmy came out of the kitchen and told Mendez to go to bed. Mendez shook Jimmy's hand, gave him a kiss on the cheek, and told him, " 'Anything you need, anything you need, I'm here

7

for you.' " While Mendez was saying goodbye to Jimmy, Bonilla "was just staring at them."

Mendez then left the casita. While Mendez was standing outside near the front door, he texted his brother who was in the upstairs apartment, " 'Come pick me up. I don't feel right over here. There is a guy tripping on me.' " He then called his brother and repeated his request to be picked up.

After Mendez left, Evelyn tried to lock the front door, but Bonilla pushed past her and went outside. Bonilla approached Mendez and punched him, then pulled out a gun and shot Mendez in the torso. Mendez tried to run away, but Bonilla shot him three more times, killing him.[5] After the fourth gunshot, Bonilla ran away. Mendez's brother heard the gunshots a few seconds after his phone call with Mendez ended.

At 3:59 a.m., officers from the Los Angeles Police Department (LAPD) received a 911 call regarding the shooting, and within minutes, arrived at the casita. Evelyn provided an officer with the phone number she used to contact Hernandez. At the officer's request, Evelyn called Hernandez's phone. Hernandez answered, and Evelyn asked if "everything was okay with that other guy." Hernandez said, "[E]verything was fine. . . . 'Don't worry. We are going to move to another casita.' "

3. *Prosecution gang expert*

LAPD Officer Frank Flores testified as a gang expert for the prosecution. He opined that both Bonilla and Hernandez were members of M.S., a very violent gang, at the time of Mendez's murder. In part based on their respective tattoos, he

---

[5]     According to the medical examiner, Mendez's cause of death was multiple gunshot wounds. In total, Mendez had four gunshot wounds.

8

indicated that both were part of the "Leeward" clique of M.S. Gang members generally gained admission to the gang by committing some type of violent act such as a robbery or a shooting against a rival. They also typically gained status in the gang through violence, and it was important for gang members to be feared by their own gang.

Actions by individual M.S. members reflect on the gang. "They are required, as members of the gang, to uphold the gang's reputation, to defend the gang's territory, to react in a certain fashion when challenged. . . . If it's a disrespect, you are required to act. If you don't, there could be repercussions . . . even from your own gang for not doing so." Sometimes M.S. members murdered fellow members, including for perceived weakness or cooperation with law enforcement.

Among M.S.'s primary activities were extortion, robbery, and drug sales. M.S. typically extorted businesses within its territory by demanding payment in exchange for protection from other local gangs.

M.S.'s chief rival was the 18th Street gang. Flores stated that violence does not necessarily result every time an M.S. member crossed paths with an 18th Street member—it depended on different factors, such as "timing and opportunity." However, Flores estimated that this rivalry had led to approximately 200 murders committed by the two gangs against each other in Los Angeles in his 16-year career. Flores opined that if a member of 18th Street went to territory belonging to M.S. and announced membership in the 18th Street gang, the 18th Street member likely "would be attacked, assaulted . . . [or] killed. There would be, without a doubt, some violence." According to Flores, the casita was in M.S. territory. He stated it would be highly

unusual for an 18th Street gang member to knowingly go into an M.S.-operated casita. It would be disrespectful for an 18th Street member to claim his gang in the presence of the M.S. member, and the M.S. member would be expected to respond, "if not immediately, then soon after." But while an M.S. member's "normal impulse" would be to assault the 18th Street member, a casita setting might affect the way the M.S. member responded.

Flores gave an opinion based on hypothetical facts that tracked the facts of the case. He testified that an M.S. member who negotiates the payment arrangement with casita owners and places other gang members inside the casita is likely "in control" and "call[s] the shots." An M.S. member who monitors the inside of the casita is likely in a lower position in the gang hierarchy. According to Flores, if an individual claimed 18th Street affiliation in the presence of a lower-ranked M.S. member monitoring a casita, "the person may seek to get some concurrence or even permission to [retaliate] there versus outside or otherwise at another place," "because it would affect the money generated by the location."

Flores opined that if someone in the casita claimed to be from the 18th Street gang in the presence of an M.S. member, and within minutes the M.S. member communicated with another higher status M.S. member who set up the extortion operation, Flores would expect the lower-ranking M.S. member to be seeking permission to take further action. Flores "would expect permission or concurrence" before taking immediate action because "[t]he key is generating money and maintaining the casita."

10

### 4. *Defense gang expert*

Alex Alonso testified as a gang expert for the defense. He stated that M.S. gang members sometimes commit shootings to benefit their gang. He testified that many encounters between M.S. and 18th Street members do not result in violence. Sometimes rival members are tolerated at a casita operated by another gang, as the gang's primary interest is making money.

### B. *Verdict, Sentence, and Appeal*

In 2012, Hernandez had a joint jury trial with Bonilla. The trial court instructed the jury on three theories of murder: (1) Mendez's death was the natural and probable consequences of Hernandez and Bonilla's attempted extortion or offer to sell drugs, (2) Hernandez and Bonilla were guilty of felony murder because Mendez was killed during the commission of burglary,[6] and (3) Mendez was killed with malice aforethought.

The jury convicted Hernandez of first degree murder of Mendez (§ 187, subd. (a)), and attempted extortion (§§ 524, 664). The jury found true that a principal personally and intentionally used and discharged a firearm causing death (§ 12022.53, subds. (b)-(e)), and the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang

---

[6] The underlying felony for the burglary was extortion or the "offer to sell a controlled substance." The theory was that every time Hernandez and/or Bonilla entered into the casita, they did so with the intention to commit extortion and sell drugs.

11

with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(B)).[7]

The trial court sentenced Hernandez to a prison term of 50 years to life, consisting of 25 years to life for the murder and 25 years to life for the firearm enhancement. As to the attempted extortion conviction, the court imposed the middle term of two years and stayed its execution under section 654.

Hernandez appealed, and we affirmed the judgment. (*People v. Hernandez, et al.* (Feb. 24, 2015, B240884) [nonpub. opn.].)

C.     *Resentencing Proceedings*

In 2019, Hernandez filed a petition for resentencing under former section 1170.95 as to his murder conviction. The superior court issued an order to show cause in 2021 and set the case for an evidentiary hearing. At the hearing in 2024, both parties relied on the transcripts from Hernandez's jury trial. No other evidence was presented.

The People argued that Hernandez was guilty of either (1) felony murder, in that he was a major participant in the underlying burglary who acted with reckless indifference to human life, or (2) implied malice murder. The People contended that even though Hernandez was not present during the shooting, "he was actively involved remotely with what was going on" and "actually ordered the killing." The defense conceded that Hernandez was a major participant but argued there was

---

[7]     The jury convicted Bonilla of first degree murder and attempted extortion. The jury found true, as to Bonilla, firearm enhancements (§ 12022.53, subds. (b), (c), (d), & (e)) and gang allegations (§ 186.22, subd. (b)).

insufficient evidence of either reckless indifference or implied malice.

The court denied the petition, finding beyond a reasonable doubt Hernandez was guilty of felony murder and implied malice murder under theories that are still valid. Hernandez timely appealed.

## DISCUSSION

A. *Section 1172.6 and Standard of Review*

Effective 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) substantially modified the law governing accomplice liability for murder in two ways. (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).) First, it narrowed the felony-murder rule by adding section 189, subdivision (e), to the Penal Code. (*Curiel*, at p. 448.) Under that provision, "[a] participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Second, SB 1437 eliminated liability for murder as an aider and abettor under the natural and probable consequences doctrine by amending section 188. (*People v. Patton* (2025) 17 Cal.5th 549, 558; *Curiel*, *supra*, 15 Cal.5th at p. 449.)

13

"[U]nder prior law, a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. [Citation.] The defendant need not have intended the murder or even subjectively appreciated the natural and probable consequences of the intended crime." (*Curiel*, at p. 449.) Now, section 188 provides that, except in cases of felony murder, "a principal in a crime shall act with malice aforethought" to be convicted of murder. (§ 188, subd. (a)(3).) "Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Ibid.*)

SB 1437 also created a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if the person could not now be convicted of murder because of the changes to sections 188 and 189. (§ 1172.6, subd. (a).) The resentencing procedure begins with the filing of a petition containing a declaration that all requirements for eligibility are met. (§ 1172.6, subd. (b)(1)(A); *Strong*, *supra*, 13 Cal.5th at p. 708.) The superior court must then determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)-(c); *Strong*, at p. 708.)

If the petitioner has made a prima facie showing he or she is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).) At the evidentiary hearing the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law,

14

including witness testimony."  (§ 1172.6, subd. (d)(3).)  The petitioner and the prosecutor may also offer new or additional evidence.  (*Ibid*.)

On appeal from an order denying a petition under section 1172.6 following an evidentiary hearing, we apply the substantial evidence standard of review.  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).)  "Under this standard, 'we review the record " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find [the necessary fact] beyond a reasonable doubt."  (*Ibid*.)  " ' "While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." ' "  (*People v. Pittman* (2023) 96 Cal.App.5th 400, 414.)  " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' "  (*People v. Navarro* (2021) 12 Cal.5th 285, 339.)

B.    *Substantial Evidence Supports the Superior Court's Finding Hernandez Is Guilty of Felony Murder*

The Attorney General argues Hernandez is guilty of felony murder as a major participant in the underlying burglary who acted with reckless indifference to human life.  Hernandez concedes he was a major participant but argues that the evidence was insufficient to support a finding of reckless indifference.

1.    *Legal principles*

A participant in the perpetration of certain enumerated felonies, including burglary, may be liable for murder if the People prove he or she "was a major participant in the underlying felony and acted with reckless indifference to human life," within the meaning of section 190.2, the special circumstances statute. (§ 189, subds. (a), (e)(3); see *Strong*, *supra*, 13 Cal.5th at p. 708.) "Section 190.2, subdivision (d), by its text, imposes an actus reus requirement, i.e., major participation in the enumerated felony, and a mens rea requirement, i.e., reckless indifference to human life." (*Emanuel*, *supra*, 17 Cal.5th at p. 882.)

"[R]eckless indifference encompasses both subjective and objective elements.  [Citations.]  'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." ' [Citations.]  'As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " ' " (*Emanuel*, *supra*, 17 Cal.5th at p. 884.) " ' "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement.' " (*Ibid*.)  " 'The degree of risk to human life is crucial to the analysis.' " (*Ibid.*)

Determining a defendant's culpability for felony murder requires a "fact-intensive, individualized inquiry" into "the totality of the circumstances." (*In re Scoggins* (2020) 9 Cal.5th 667, 683 (*Scoggins*); accord, *Emanuel, supra,* 17 Cal.5th at pp. 883, 885.) To help determine whether a major participant acted with reckless indifference to human life, our Supreme Court in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) " 'set out a nonexhaustive list of considerations relevant to this determination, including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.' " (*Emanuel,* at p. 884; see *Strong, supra,* 13 Cal.5th at p. 706, citing *Clark,* at pp. 618-623.) " ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Emanuel,* at p. 885; accord, *Clark,* at p. 618.) The "factors identified as relevant to the reckless indifference inquiry must not supplant the standard they are meant to elucidate." (*Emanuel,* at p. 896.) "The essential question underpinning our analysis" of the *Clark* factors is "what [the defendant's] actions reveal about his mental state." (*Emanuel,* at p. 891.)

2. *Substantial evidence of reckless indifference*

Considering the *Clark* factors and the totality of circumstances, we conclude substantial evidence supports the finding Hernandez knowingly created "a grave risk of death." (*Emanuel, supra,* 17 Cal.5th at p. 884.)

a. *Use or awareness of the presence of weapons*

"A defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed

17

robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 618.) In addition to personal use of a weapon, the defendant's *knowledge* that an accomplice will be armed or will use a weapon during the planned felony is a factor to be considered in determining a defendant's mental state, but "the mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid.*; see *People v. Banks* (2015) 61 Cal.4th 788, 809 (*Banks*) [defendants "who simply had awareness their confederates were armed and armed robberies carried a risk of death . . . lack the requisite reckless indifference to human life"].)

Not having been present at the scene, Hernandez did not personally use a weapon on the night of the murder. However, Bonilla carried and used a gun that night, and Hernandez concedes he knew Bonilla was armed. Further, the evidence demonstrates Hernandez purposefully stationed Bonilla in the casita knowing his brother was armed. This factor thus weighs in favor of a finding of reckless indifference. (Cf. *Emanuel, supra,* 17 Cal.5th at p. 885 [no evidence in the record that defendant knew accomplice would bring a gun to the robbery that led to killing by the accomplice].)

b. *Physical presence at the scene and opportunity to restrain confederates or aid victim*

The Supreme Court in *Clark* noted "the importance of [a defendant's] presence to culpability." (*Clark, supra,* 63 Cal.4th at p. 619.) Presence "may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a

18

willingness to use lethal force.  In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts." (*Ibid*.)  In *Scoggins*, *supra*, 9 Cal.5th 667, the court found it significant that the defendant who planned an unarmed robbery was not physically present at the time of the shooting by his accomplice during the robbery.  (*Id*. at p. 667.)  Rather, the defendant "remained at a nearby gas station during the course of the crime and did not arrive at the crime scene until after the shooting occurred." (*Id*. at p. 678.)  Evidence supported the defendant's claim that he was "unaware in real time that [his cohort] was deviating from the original plan" for no weapons to be used.  (*Id*. at pp. 678-679.)

However, "physical presence is not invariably a prerequisite to demonstrating reckless indifference to human life.  Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims." (*Clark*, *supra*, 63 Cal.4th at p. 619, citing *People v. Williams* (2015) 61 Cal.4th 1244, 1281-1282 [sufficient evidence of reckless indifference where defendant, although absent from the murder scene, "repeatedly instructed gang members to shoot a victim who resisted" and later "awarded them stripes for the murder"]; accord, *Scoggins*, *supra*, 9 Cal.5th at p. 679 ["emphasiz[ing]" physical presence at the scene is not required to demonstrate reckless indifference].)  "Especially in light of emerging technologies, a defendant who

plans and directs a murder from afar may be just as culpable as a defendant who is physically present at the scene of the crime." (*Scoggins*, at p. 679.)

"[W]here a crime unfolds quickly, . . . the failure to restrain a cohort . . . cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Emanuel, supra*, 17 Cal.5th at p. 892.) "This requires some awareness of the risk of impending lethal violence and time to react," such as when the actual killer makes his or her intentions clear, thus affording the defendant " 'the time to observe and react before the murder.' " (*Ibid.*) In *Scoggins*, the Attorney General argued the defendant could have restrained his accomplices because he was in constant communication with them before the shooting and "could have instructed them to avoid using lethal force." (*Scoggins, supra*, 9 Cal.5th at p. 679.) However, the court determined that "although [the defendant] was in close contact with his accomplices before the shooting, he lacked control over their actions once they arrived on the crime scene, especially given how quickly the shooting occurred." (*Ibid.*) There was no evidence that the defendant had instructed his confederates to kill anyone, or that "he directed his accomplices to deviate from the plan once they arrived at the crime scene." (*Ibid.*)

Hernandez's situation was quite different from that of the defendant in *Scoggins*. Although Hernandez was not present inside or outside the casita, Bonilla and Hernandez shared several text messages and phone calls minutes before the murder, and both direct and circumstantial evidence support a reasonable inference that Hernandez was not only aware that

20

Bonilla intended to shoot and kill Mendez, but that he commanded or authorized Bonilla to do so.

The evidence allows a reasonable inference that Hernandez was the M.S. shot-caller who set up the extortion plan and controlled lower-ranking gang members involved in the scheme, including Bonilla. Jimmy testified Hernandez said he was the one "supervising" the operation and the one "who gave orders." Hernandez stated he had "people who worked underneath him" and "took care of the area for him." Hernandez stated he would send Bonilla to supervise inside the casita and make sure no one else sold drugs. Moreover, Jimmy observed that all the payment negotiations were done by Hernandez, and although Bonilla was present during the negotiations, he did not participate and was not even introduced.

The prosecution's gang expert, when asked a hypothetical that tracked the facts of the case, testified that someone in Hernandez's position (i.e., an M.S. member who negotiated the arrangement with casita owners and placed other gang members inside the casita) was likely "in control" and "call[ed] the shots." He further opined that someone in Bonilla's position (i.e., an M.S. member who monitored the inside of the casita) was likely lower in the gang hierarchy.

According to Flores, if an individual claimed 18th Street affiliation in the presence of a lower-ranked M.S. member monitoring a casita, that M.S. member would be required to retaliate, but "may seek to get some concurrence or even permission" regarding how to do so because it would affect the money generated by the casita. The evidence supported a reasonable inference that Bonilla sought such guidance or permission from the shot-caller Hernandez.

21

According to Evelyn's testimony, Bonilla angrily picked up his phone during the time that Mendez was making a scene in the casita, claiming his 18th gang membership, lifting up his shirt to show his tattoo, telling other customers no one could touch him because he was from the 18th Street, and telling Jimmy that "it was his territory" and "if anything happened, he was there to take care of it." During these events, Bonilla texted Hernandez twice and Hernandez called him at least once. Although the contents of the texts and calls were not available, there was other evidence of the nature of the communications.

First, Evelyn testified that after she approached Bonilla and asked him to calm down, he told her he would not calm down, and that he was texting his brother to let him know "to see what was going to happen." In follow-up questioning, Evelyn confirmed Bonilla in essence said he was texting his brother to ask "what was next."

In addition, Flores testified that if someone in the casita claimed to be from the 18th Street gang in the presence of an M.S. member, and within minutes the M.S. member communicated with another higher ranking M.S. member who set up the extortion operation, Flores would expect that communication to include the lower-ranking member seeking permission to take further action. Flores "would expect permission or concurrence" before taking immediate action because "[t]he key is generating money and maintaining the casita."

Bonilla did not take immediate action in response to Mendez's provocative conduct. Rather, after two texts and at least one phone call with Hernandez, he waited until Mendez left, followed him outside, and shot him without any further

provocation. The evidence allows a reasonable inference that Bonilla asked his brother for permission or guidance before he did so. This scenario is thus markedly different from the one in *Scoggins*, where the court concluded there was no evidence to show the defendant directed his cohorts to shoot the victim. (*Scoggins*, *supra*, 9 Cal.5th at p. 679; cf. *Banks*, *supra*, 61 Cal.4th at p. 807 [evidence of call records showing the defendant spoke to his actual killer accomplice numerous times "either hours before or shortly after the killing," without any evidence of the content of the calls, did nothing to demonstrate defendant was a major participant in the murder].) The evidence here suggests Hernandez had an opportunity to restrain Bonilla but did not do so, and supports a reasonable inference that Hernandez gave the order to shoot Mendez. This factor strongly weighs in favor of finding Hernandez acted with reckless indifference.

    c.  *Duration of the crime*

  "The duration of the interaction between victims and perpetrators" is another factor to consider. (*Clark*, *supra*, 63 Cal.4th at p. 620.) "A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence." (*Emanuel*, *supra*, 17 Cal.5th at p. 886.) In *Clark*, the court observed that "although the planned robbery was to be of substantial duration, . . . the period of interaction between perpetrators and victims was designed to be limited." (*Clark*, at p. 620.) Thus, the court concluded "the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that defendant exhibited reckless indifference to human life." (*Id*. at pp. 620-621.)

23

Hernandez's extortion scheme at the casita was an ongoing, nightly operation with no end date, and the intended victims were the casita's owners. Bonilla's violence was not directed at them. Except for the few seconds in which Bonilla punched and then shot Mendez, the two had no direct interactions. Given Bonilla's interaction with Mendez was not a planned part of the extortion activities, the duration of the contact between Bonilla and Mendez is not particularly probative of Hernandez's state of mind. Mendez happened to come into the casita, and in his drunken state, refused to leave, started arguing with other customers, and announced his allegiance to a rival gang. There is no evidence Bonilla, much less Hernandez, knew in advance that Mendez would be there. To the contrary, Hernandez had told Evelyn that with the casita under his protection, "cholos" would leave the casita alone. However, Bonilla's killing of Mendez also cannot fairly be described as spontaneous. As discussed, Bonilla and Hernandez communicated repeatedly during the time Mendez was present in the casita. (Cf. *Banks*, *supra*, 61 Cal.4th at p. 87 [fact that accomplice's killing of victim "was apparently a spontaneous response to armed resistance from the victim" supported conclusion defendant did not know his own actions would involve a grave risk of death].) The "duration of the crime" factor is thus neutral in this case.

        d.     *Efforts taken to minimize the risk of violence*

"Efforts at the planning stage to minimize the potential for violence . . . are viewed as a distinct factor from efforts to restrain confederates once the felony is underway." (*Emanuel*, *supra*, 17 Cal.5th at pp. 887-888.) Hernandez did not present any evidence or argue at the section 1172.6 evidentiary hearing that he engaged in efforts to minimize the risk of violence in the

underlying burglary, and the People do not address this factor. The extortion plan involved placing an armed M.S. member inside the inherently dangerous setting of a casita, knowing that rival gang members were in the area. Although Hernandez told Evelyn and Jimmy he intended for his subordinates' presence at the casita to deter members of other gangs or other criminals from entering the casita, there is no evidence Hernandez instructed Bonilla not to engage in violence should a rival gang member enter the casita. This factor thus does not weigh in Hernandez's favor.

    e.  *Knowledge of cohort's likelihood of killing*

  A defendant's knowledge of a cohort's propensity to kill is another factor to weigh, because "[a] defendant's willingness to engage in an armed [felony] with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a 'grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 621; accord, *Emanuel*, *supra*, 17 Cal.5th at p. 885.) In determining whether there was evidence of a defendant's knowledge of an accomplice's likelihood of using lethal force, the California Supreme Court in "*Banks* caution[ed] against relying too heavily on gang membership where there is no evidence the defendant or his confederates 'had ever participated in shootings, murder, or attempted murder, or even that any member of their clique had.' " (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 990; accord, *People v. Keel* (2022) 84 Cal.App.5th 546, 561, fn. 5; see *Banks*, *supra*, 61 Cal.4th at pp. 810-811.)

  No evidence was introduced that Bonilla or anyone else in the Leeward clique of M.S. to which he and Hernandez belonged had "previously committed murder, attempted murder, or any other violent crime." (*Banks*, *supra*, 61 Cal.4th at p. 805

25

[although defendant and confederates were gang members, there was no evidence that any of them had previously committed violent crimes].)[8]  Given there was no individualized evidence presented at trial regarding Bonilla's propensities, we will heed the Supreme Court's admonition and not assume based on Bonilla's membership in M.S. that he had a propensity for lethal violence or that Hernandez was aware of such a propensity.  This factor thus does not weigh in favor of finding reckless indifference by Hernandez.

      f.     *Totality of the circumstances*

Ample evidence demonstrated Hernandez was an M.S. shot-caller who, in his words, "gave orders" to "people who worked underneath him."  The evidence also demonstrated Bonilla was a lower-status gang member who was required to follow Hernandez's orders with respect to the casita extortion scheme.  Hernandez intentionally placed Bonilla in the casita knowing his brother was armed.  Although Hernandez may not have anticipated ahead of time that someone like Mendez would enter the casita and start claiming membership in the rival gang, Bonilla did not act alone or spontaneously when he shot Mendez.  Rather, Hernandez and Bonilla were in frequent communication by text and phone after Mendez began engaging in provocative acts inside the casita.  Bonilla said he was advising Hernandez of the situation and asking him "what was next."  The evidence permits a reasonable inference that, despite Mendez's unanticipated presence and behavior, Hernandez had "some

---

[8]     Bonilla was deported to Honduras at some point after a gang-related arrest at age 16, and it was unclear how long he had been back in the United States before committing the murder of Mendez.

awareness of the risk of impending lethal violence and time to react" and "a meaningful opportunity" to restrain Bonilla from killing Mendez.  (*Emanuel*, *supra*, 17 Cal.5th at p. 892.)  He failed to do so.  Rather, a factfinder reasonably could infer that Hernandez used his authority and control over Bonilla to direct Bonilla to shoot Mendez.  (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 679 [no showing of reckless indifference where defendant "lacked control" over his cohort's actions at the crime scene].)  Weighing all the factors and considering the totality of the circumstances, we conclude substantial evidence supports the superior court's determination that Hernandez acted with reckless disregard for human life and was guilty of felony murder under a still-valid theory.

### DISPOSITION

We affirm the judgment.

STONE, J.

We concur:

MARTINEZ, P. J.

SEGAL, J.